## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| MARCUS THORNTON, et al, <br><br> *Plaintiffs*, <br><br>       v. <br><br> ANTONY J. BLINKEN, in his official capacity as Secretary of the U.S. Department of State and in his individual capacity; <br><br> THE U.S. DEPARTMENT OF STATE; <br><br> CAROL PEREZ in her official capacity as Director General of the Foreign Service and Director of Global Talent Bureau in the Bureau of Global Talent Management at the U.S. Department of State and in her individual capacity; <br><br> MARCIA S. BERNICAT in her official capacity as Director General of the Foreign Service and Director of Global Talent in the Bureau of Global Talent Management at the U.S. Department of State and in her individual capacity; <br><br> *Defendants*. | CASE No.: 1:23-cv-00266-PTG-ID <br><br><br><br> JURY TRIAL DEMANDED <br><br><br><br><br><br> August 18, 2023 |

## SECOND AMENDED CLASS COMPLAINT

1.     COMES NOW, Putative Class Representative ("PCR") Marcus Thornton, together with all Plaintiffs identified in this Class Complaint and other as yet unidentified Plaintiffs who may be party to this Class Compliant ("Plaintiffs"), by and through their attorneys, pursuant to Federal Rule of Civil Procedure 15(a)(1)(A) and submit this Class Complaint, and state the following in support of their Class Complaint and Jury Demand against the U.S. Department of State, *et al*, (the "Department" or "the State Department").

## INTRODUCTION

2.      In pursuit of its COVID-19 vaccination objectives, the U.S. Department of State, which has as one of its "central goal(s)" the "promotion of respect for human rights," including religious freedom as a "core objective," has turned its back on this mission with respect to the people who carry it out.

3.      In an attempt to "render being unvaccinated so burdensome that those who haven't received shots will have little choice other than to get them,"[1] the Department set up a separate and more onerous process for religious accommodation for those with religious objections to the COVID-19 vaccine; required invasive and burdensome testing, masking, and social distancing protocols; and took myriad forms of adverse actions against Plaintiffs.

4.      The Department engaged in a pattern and practice of religious and disability discrimination when it ignored Plaintiffs' valid religious beliefs and medical disabilities and treated Plaintiffs whom they believed were infected with a deadly communicable disease differently, and more harshly, than others.

5.      Department employees with religious objections to the vaccines have endured various forms of physical invasion, lack of acknowledgement and accommodation, professional and interpersonal humiliation, privacy breaches, loss of travel and training opportunities, constructive discharge, and countless other instances of discriminatory behavior as a direct result of their sincerely held religious beliefs.

6.      Moreover, the Defendants harassed, ostracized and humiliated Plaintiffs whom they believed were infected with a deadly contagious disease.

---

[1] Maegan Vasquez, *Biden announces measures to incentivize COVID-19 vaccinations, including a requirement for federal employees*, CNN.com, (July 29, 2021), available at: https://www.cnn.com/2021/07/29/politics/joe-biden-vaccination-requirement-announcement/index.html (last visited, May 6, 2022).

7.      Ironically, the Department employs these individuals to uphold human rights around the globe. The Department then turns around and denies the same treatment to them, as if they wouldn't notice, but it is literally their job to know better. These individuals, whose mission it is to fight for the ideals of liberty and respect for human rights, bring this suit to insist that the U.S. Department of State upholds the standards it claims to uphold in accord with its statutory and constitutional obligations, and to bring accountability to those who have made a mockery of its mission.

## PARTIES

8.      PCR Marcus Thornton is a member of the Foreign Service and is the recipient of three Meritorious Honor Awards—two of those for being "a consistent advocate and defender of human rights and religious freedom and taking life saving measures in defense of human rights." He has an excellent performance record and at all times during his tenure (including as recently as May 15, 2023), was rated "satisfactory or better."

9.      Mr. Thornton is a Christian, who believes that he is "made in the image of God," and that his "body belongs to [God]" and not to anyone else. Accordingly, because his body is a temple of God, "[c]ompliance with the COVID mandates would violate [his] sincerely held religious beliefs." He states, "The Bible instructs us to 'Render unto Caesar the things that are Caesar's, and unto God the things that are God's.'"

10. Mr. Thornton was prepared to request a religious accommodation but learned that the State Department had set up a completely different and more onerous and invasive process for determining eligibility for a religious accommodation regarding the COVID-19 vaccine. He recognized the issue and, rather than participate in a different program for religious accommodation to the vaccine, he filed an Equal Employment Opportunity complaint with the State Department on October 28, 2021, which he formalized as a class complaint on January 27, 2022. In filing his EEOC

complaint he made clear that his Christian religious beliefs prevented him from taking the vaccine and he thereby informed the Department that those beliefs conflicted with their policy of mandatory vaccination. He states:

> While I have consistently asserted a sincerely-held religious belief that prohibits my participation in the mandates, I cannot in good conscience participate in a process that both discriminates against my religious beliefs and places my employer in a position where it asserts the right to conduct a religious test on me as a condition of my continued qualification to an office of public trust. To do so would violate not only my religious convictions, but the oath I have taken multiple times to uphold the Constitution.

11.    Since that time, he has endured escalating discriminatory pressure to abandon his principles. For example, while he was enrolled at the Foreign Service Institute during the summer of 2022, he was prevented from entering campus during mandatory training and thus was unable to fully participate in critical foreign language training for his role.

12.    For more than two months, he was subject to weekly emails threatening disciplinary action, "up to and including separation." He has endured written harassment from colleagues that is the subject of a complaint but that the Department has not addressed.

13.    The Department denied him travel and training opportunities, specifically in May, 2023, to be trained as an EEO counselor, after having been endorsed by the embassy to serve in that capacity.

14.    Further, he was wrongfully placed on LWOP (Leave Without Pay) while he was on pre-approved parental leave and, although the Department later rescinded that decision, it has still not given him his salary for that period of time.

15.    Finally, he was denied use of his annual and parental leave on multiple occasions without adequate justification, and on July 5, 2023, was abruptly put on notice of involuntary curtailment of his overseas tour in Bishkek, Kyrgyz Republic, where he is stationed with his wife and four young children, including an infant.

16.     Mr. Thornton is the Co-Founder and President of the non-profit organization Feds for Medical Freedom ("F4MF"). F4MF is a membership organization with over 9000 members who are employees or contractors for nearly every federal agency and located in every U.S. state and many foreign countries. The purpose of Feds for Medical Freedom is to protect employee rights by fighting back against the federal government's persistent mandates requiring employees and contractors to get vaccinated or be fired. Most, if not all Plaintiffs, identified herein are members of F4MF and share its mission and its values.

17.     Plaintiff Marie Ballerini-Hougnon is an individual and current or former employee of the Department.

18.     Plaintiff Michael Ball is an individual and current or former employee of the Department.

19.     Plaintiff Salima Benabdi is a is an individual and current or former employee of the Department.

20.     Plaintiff Eric Burkett is an individual and current or former employee of the Department.

21.     Plaintiff Donald Carroll is an individual and current or former employee of the Department.

22.     Plaintiff Jane Chun is an individual and current or former employee of the Department.

23.      Plaintiff Brock Fox is an individual and current or former employee of the Department.

24.     Plaintiff David Guerrero is an individual and current or former employee of the Department.

25.     Plaintiff Homer Hawkins is an individual and current or former employee of the Department.

26.     Plaintiff William Hayes is an individual and current or former employee of the Department.

27.     Plaintiff Matthew Hilton is an individual and current or former employee of the Department.

28.     Plaintiff Daniel Jackson is an individual and current or former employee of the Department.

29.     Plaintiff Lisa Jones is an individual and current or former employee of the Department.

30.     Plaintiff Christopher Kelly is an individual and current or former employee of the Department.

31.     Plaintiff Cheryl Koevoet is an individual and current or former employee of the Department.

32.     Plaintiff Nancy McGauvran is an individual and current or former employee of the Department.

33.     Plaintiff Christopher Miller is an individual and current or former employee of the Department.

34.     Plaintiff Karolina Miller is an individual and current or former employee of the Department.

35.     Plaintiff David Pemberton is an individual and current or former employee of the Department.

36.     Plaintiff Kemmi Sadler is an individual and current or former employee of the Department.

37.     Plaintiff Jeffrey Rusinek is an individual and current or former employee of the Department.

38.     Plaintiff Kelly Medina Santiesteban is an individual and current or former employee of the Department.

39.     Christina Williams is an individual and current or former employee of the Department.

40.     Plaintiff Joel Zlotnik is an individual and current or former employee of the Department.

41.     Defendant U.S. Department of State is an Agency of the United States government. Its mission is "[t]o protect and promote U.S. security, prosperity, and democratic values and shape an international environment in which all Americans can thrive." The Department's workforce includes some 13,000 members of the Foreign Service, 11,000 Civil Service employees, and 50,000 locally employed staff at more than 270 diplomatic missions worldwide for a total workforce of over 78,000.  Department of State, Global Talent Management, *GTM Fact Sheet, Facts about Our Most Valuable Asset – Our People*, June 30, 2023. https://www.state.gov/wp-content/uploads/2023/07/GTM_Factsheet_June-2023.pdf.

42.     Defendant Antony Blinken is the Secretary of State for the United States and oversees the operations of the State Department, which include the COVID-19 vaccination, testing and masking policies at issue here. All plaintiffs are members of the Agency that he oversees. He is sued in his official capacity except with regard to the Religious Freedom Restoration Act claims, where he is sued in his individual capacity.

43.     Defendant Carol Perez was the Director General of the Foreign Service and Director of Global Talent Bureau in the Bureau of Global Talent Management at the State Department. She had direct involvement in the implementation of COVID-19-related personnel policies. She is sued

in her official capacity except with regard to the Religious Freedom Restoration Act claims, where she is sued in her individual capacity.

44.      Defendant Marcia Bernicat is the current Director General of the Foreign Service and the Director of Global Talent. She has continued the policies of her predecessor, resulting in the discrimination complained of here. She is sued in her official capacity except with regard to the Religious Freedom Restoration Act claims, where she is sued in her individual capacity.

## JURISDICTION AND VENUE

45.      This Court has jurisdiction under 5 U.S.C. §§ 701–706, and 28 U.S.C. §§ 1331, 1346, 1361, §1343(a)(4) 2201, under the United States Constitution.

46.      Venue is proper under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(e)(1)(B) because the United States, one or more of its agencies, and one or more of its officers in his or her official capacity are Defendants; and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, at the Foreign Service Institute, which is in Arlington, Virginia.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Vaccine Mandate

47.      COVID-19 was declared to have reached pandemic status on March 11, 2020, "shepherding the world into a tumultuous period marked by fear, isolation, sickness, death – and finger-pointing." Cecelia Smith-Schoenwalder, *Three Years of Death – and Finger-pointing*, U.S. NEWS AND WORLD REPORT, (March 10, 2023), https://www.usnews.com/news/the-report/articles/2023-03-10/three-years-into-the-pandemic-who-is-dying-from-covid-19-now#:~:text=Three%20Years%20of%20Death%20%E2%80%93%20and,to%20know%20how%20it%20started.

48.      On January 20, 2021, President Biden issued EO 13991, 86 Fed. Reg. 7045, which established a Safer Federal Workforce Task Force and charged it with "provid[ing] ongoing guidance

to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID-19 pandemic." 86 Fed. Reg. at 7046.

49.     On September 9, 2021, President Biden announced that while "fully vaccinated" individuals are "highly protected from severe illness even if [they] get Covid-19," and that being fully vaccinated renders these individuals "as safe as possible," he was nonetheless issuing vaccine mandates "to protect vaccinated workers from unvaccinated co-workers." *Id.* One mandate directed that federal agencies create and implement the vaccine mandates for federal employees and contractors.

50.     The President said he would "sign an executive order that will now require all executive branch federal employees to be vaccinated—all." Press Briefing by Press Secretary Jen Psaki, July 23, 2021, https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/23/press-briefing-by-press-secretary-jen-psaki-july-23-2021/.

51.     That same day, he issued EO 14043, which states "it is necessary to require COVID-19 vaccination for all Federal employees, subject to such exceptions as required by law." 86 Fed. Reg. 50989. EO 14043 tasked every federal agency with "implement[ing], to the extent consistent with applicable law, a program to require COVID-19 vaccination for all of its federal employees." *Id.* at 50990. The Agencies were to receive "implementation" guidance from the Task Force, which would issue guidance within seven days. *Id.*

52.     Yet as early as August 2021, it was public knowledge that while the vaccine worked well in preventing severe illness and death, it did "not prevent transmission" of the disease, particularly as it related to the Delta variant, which comprised 93% of all cases at the time. Holcombe and Maxouris, *CDC head says COVID-19 vaccines prevent severe illness and death, but they can't prevent transmission*, CNN.com, (August 16, 2021), at https://www.cnn.com/us/live-news/coronavirus-pandemic-vaccine-updates-08-06-21/h_61de1502e86060f5faf4477339928e33.

*See also*, Singanayagam, Ankia, PhD, *et al, Community transmission and viral load kinetics of the SARS-CoV-2 delta (B.1.617.2) variant in vaccinated and unvaccinated individuals in the UK: a prospective, longitudinal, cohort study*, The Lancet, Infectious Diseases, October 29, 2021, https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(21)00648-4/fulltext (British study finding that "fully vaccinated individuals with breakthrough infections have peak viral load similar to unvaccinated). [2]

<u>Department of State Policy</u>

53.   Nevertheless, the State Department implemented this mandate and in doing so, created a new and much more onerous process for requesting a religious exemption to the vaccine separate from its existing processes for requesting any other type of religious exemptions.

54.   The policy dictated that all covered employees must be fully vaccinated and provide proof of vaccination by November 22, 2021. See Department of State, *COVID-19 Vaccination Requirement for Department of State Employees Frequently Asked Questions*, Q&A, A(3).

---

[2] Indeed, while claims were made by many about the vaccine's efficacy at preventing infection and transmission, it has been a matter of public record since at least November 2020 that the vaccines were not authorized for prevention of infection or transmission of Covid-19. Reuters Fact Check, *Fact Check-Preventing transmission never required for COVID vaccines' initial approval; Pfizer vax did reduce transmission of early variants*, (October 14, 2022) at https://www.reuters.com/article/factcheck-pfizer-vaccine-transmissionidUSL1N31F20E. ("As clinical trial data on vaccine efficacy against the main endpoints – symptomatic and severe disease -- began to be released in November 2020… researchers and regulators made clear in public statements that the vaccines' effect on virus transmission remained unknown.") In early April 2021 the emergency covid vaccines became available to everyone 16 and older. Jacqueline Howard, *All 50 states now have expanded or will expand Covid vaccine eligibility to everyone 16 and up*, CNN.com, at https://www.cnn.com/2021/03/30/health/states-covid-19-vaccine-eligibility-bn/index.html#:~:text=All%2050%20states%20now%20have,to%20everyone%2016%20and%20up&text=All%2050%20states%20have%20announced,haven%27t%20done%20so%20already. That same month, the CDC was required to admit that "breakthrough infections" were occurring. Apoorva Mandavilli, *Can Vaccinated People Spread the Virus? We Don't Know, Scientists Say*, NEW YORK TIMES, (April 1, 2021) at https://www.nytimes.com/2021/04/01/health/coronavirus-vaccine-walensky.html (quoting CDC spokesperson as saying "[i]t's possible that some people who are fully vaccinated could get Covid-19. The evidence isn't clear whether they can spread the virus to others. We are continuing to evaluate the evidence"). A few months later, On July 30, 2021, the CDC publicly acknowledged that both vaccinated and unvaccinated people carry "similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people, which suggest[s] an increased risk of transmission. Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR, July 30, 2021, https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html. As a consequence, the CDC stated that both vaccinated and unvaccinated should wear masks.

55.     Department of State covered employees included "all State Department direct hire Foreign Service and Civil Service, Eligible Family Members employed by the Department on a Family Member Appointment, and Re-employed Annuitants serving overseas or domestically." *Id.* at Q&A, A(3).

56.     The policy created an exemption only for employees with "approved disability and religious accommodations" (*id.* at Q&A, A(10)) and threated that Employees who failed to complete the certification form and/or comply with the COVID-19 vaccination requirements with "disciplinary action, up to and including separation." *Id.* at Q&A, E(1). This threat would be reinforced consistently over the next year or more.

57.     Since the implementation of the vaccination requirement, the State Department, in addition to setting up a novel procedure for religious accommodation related to it, adopted an uneven, lackadaisical approach to issuing religious accommodations, while at the same time ratcheting up pressure on those who have expressed religious belief to vaccinate, despite their convictions. For example:

a.   On December 30, 2021, the Deputy Secretary for Management and Resources issued a Department Notice #93574, which strongly encouraged all employees and eligible family members to receive booster shots.

b.   On January 3, 2022, the Chief Medical Officer of the Department of State, Dr. Larry Padget, issued an email (subsequently published in Department Notice #93625) that again encouraged all employees to receive booster shots, and asserted that those who received boosters were less likely to die than those who had received the vaccines.

c. On January 21, 2022, the Undersecretary for Management (M) issued Department Notice #93820. In it, M stated, "The most effective way to respond to the COVID-19 pandemic and the Omicron variant is to ensure that you have received a primary vaccine series and booster."

11

d. On June 16, 2021, Ian J. McCary, Deputy Chief of Mission, U.S. Embassy, Kabul wrote an email to Mailing List, emphasizing that "[g]etting vaccinated is the best way possible to protect you and your colleagues," (and highlighting that there had been two recent deaths of employees due to COVID").

58.     In no Department correspondence has MED or any other Department leadership ever acknowledged those employees who have religious objections to the mandate or recognized their objections as legitimate. The Department has not acknowledged in any way – including with any focus on inclusivity or equity – this group of religious believers who cannot participate in the medical interventions that the Department has imposed on its workforce.

59.     At the same time, they receive both official and unofficial communications indicating that they are, by exercising their religious beliefs, endangering others and that the Department desperately wants them to act against those beliefs.

60.     These official communications have fostered an environment at the Department where indiscriminate ridicule pervades everyday conversation throughout the Department, sending the clear message that those with disfavored religious beliefs are unwanted or that their beliefs are unwanted.

61.     The Department has done nothing to mitigate either this discriminatory environment or these discriminatory acts.

62.     As indicated above, Plaintiff Marcus Thornton recognized that the Department deviated from its standard practice for religious accommodation requests, providing for different consideration and treatment from that given to religious beliefs about all other types of issues.

63.     The religious accommodation process in place at the beginning of the pandemic was just over a single page long. It gave supervisors authority to grant accommodations so long as the request was not an undue burden on the Department. *See* Memorandum from Manager Support Unit

(MSU) Global Talent Management, *Religious Accommodation Request Process*, in place as of September 1, 2021. It required supervisors to contact the executive office point of contact and the legal team if they were inclined to deny an accommodation. *Id.*

64.     The process memorandum stated that:

> The manager should talk to the employee to determine what accommodation the employee is seeking (e.g., not wearing a mask on Department premises, full-time telework, etc.) and what other accommodations might work for the employee. *Management can ask the employee for reasonable information about the religious belief or practice at issue to determine what accommodations may be available.* All communications about a religious accommodation request should be in writing, either initially or as a follow-up, to ensure accuracy and preservation of the conversation.

> *Id.* (emphasis added).

65.     The new process included instructions to for employees to complete an invasive and onerous form detailing employees' most personal and private religious beliefs. *See* U.S. Department of State, Request for a Religious Accommodation to the COVID-19 Vaccine Requirement policy, October 2021.

66.     For example, the form required employees to answer the following questions:

    a.  Please describe the nature of your objection to the COVID-19 vaccination.
    b.  Would complying with the COVID-19 vaccination requirement substantially burden your religious exercise? If so, please explain how.
    c.  How long have you held the religious belief underlying your objection?
    d.  Please describe whether, as an adult, you have received any vaccines against any . . . [other disease].
    e.  If you do not have a religious objection to the use of all vaccines, please explain why.
    f.  If there are any other medicines or products that you do not use because of the religious belief underlying your objection, please identify them.
    g.  Please provide any additional information that you think may be helpful in reviewing your request.

> *Id.*

67.     Rather than participate in a different more invasive and burdensome program designed solely for religious accommodation requests to the vaccine mandate, Mr. Thornton filed an

Equal Employment Opportunity complaint with the State Department on October 28, 2021, which he formalized as a class complaint on January 27, 2022.

68.     In doing so, he explained that his Christian religious beliefs conflicted with the vaccine mandate and requested that he be permitted to use the standard religious accommodation form that was used across the Department.

<u>Failure to Accommodate Religious Beliefs</u>

69.     Mr. Thornton was not granted the opportunity to apply for an accommodation using the standard process that was in place and the Department did not respond to or grant his request to be exempt from the vaccine mandate.

70.     As part of the pattern and practice of discriminatory treatment Mr. Thornton and other Plaintiffs were subjected to as a religious objectors, leadership required Mr. Thornton to test using nasal swabs. The Department issued test kits to him and other Plaintiffs labeled "RX-Only" without a prescription, by non-medical personnel, and without instruction regarding how to use the swabs properly. His inquiries did not result in the Department's acknowledgment of the inappropriateness of its approach.

71.     Many other Plaintiffs were also denied religious accommodations. Indeed, upon information and belief, of the 25 putative class members who are currently identified in the instant complaint, 19 filed an actual request for a religious accommodation to the vaccine or did not file a written request (because they objected to the new process put in place solely for the purpose of religious accommodations for the vaccine), but made their religious objections to the vaccine known to leadership orally and/or via EEOC complaint.[3]

72.     Upon information and belief, the Department effectively denied and/or ignored every religious accommodation request it received.

_____

[3] Upon information and belief, and as will become clear during discovery, many foreign consulates did not offer any many religious accommodation process at all, denying employees the right to protect their religious freedoms.

73.     The Department never explicitly denied Plaintiffs' requests; rather the government completely ignored at least 12 Plaintiffs' requests, leaving them in limbo, fearing for their livelihoods and their families for over a year and a half until President Biden rescinded EO 14043 in May 2023.

74.     Those employees were forced to mask, socially isolate, and test and were generally deprived of the ability to travel or participate in on-site work functions. They suffered harassment, public "outing" and humiliation for being singled out as non-compliant, and at least one was constructively discharged.

75.     Interestingly, the Department purported to grant the accommodation requests of five Plaintiffs, yet subjected them to the exact same masking, distancing, testing protocols and other restrictions as the Plaintiffs whose claims were left unadjudicated.

Disability Discrimination

76.     Moreover, two identified Plaintiffs objected to the vaccine based on their medical disabilities as likely did many more.

77.     Plaintiff Marie Ballerini-Hougnon suffered two brain aneurysms and a cerebral hemorrhage after enlisting in the U.S. Army in 2009 and sought to avoid the vaccine out of concern that it may exacerbate or re-injure the condition that had led to these events.

78.     She also has a neurological disorder, her brother and father both suffered myocardial infarctions at early ages (37 and 53, respectively), and she had a family history of strokes and thrombophilia. She is rated 100% permanently disabled by the Veterans Administration ("VA"), which the Department was aware of upon her hiring, as she received a "Veteran's Preference," (a government preference for hiring disabled veterans).

79.     Despite this, her request for a medical accommodation was denied, and the medical officer in charge told her that "none of the conditions [she] listed were contraindications of the vaccine particularly with the mRNA which carries no risk of blood clots." This statement turned out

to be patently wrong. *See e.g.*, National Institute of Health, National Library of Medicine, National Center for Biotechnical Information, PMC, *Relationship between blood clots and COVID-19 vaccines: A literature review*, published online 2022 Apr 26. doi: 10.1515/biol-2022-0035, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9055170/. ("One of the causes for concern among the researchers, physicians, and generally the whole community from the onset of vaccination has been the adverse effects (specifically blood clots) that may be observed after the injection of the COVID-19 vaccine. In some countries, such concerns have even resulted in the temporary or permanent discontinuation or abandonment of the application of some vaccines . . ."

80.     Mr. Ballerini-Houghon explained to the Management Officer (Mr. Kirby) at the embassy in which she worked, that the vaccine could kill her, and she felt she was being discriminated against because of her disability. Mr. Kirby literally laughed at her and made it clear to her that no accommodation would be forthcoming; she could either take the vaccine or leave the embassy.

81.     Convinced that she would not receive a medical accommodation, Ms. Ballerini-Hougnon was forced to tender her resignation rather than risk a serious health event. She resigned from the position that she "loved" on October 14, 2021.

82.     Likewise, Salima Benabdi (a French Language and culture instructor at the Department's Foreign Service Institute, where she has worked for 22 years) requested a medical exemption for an accommodation to her depression which the vaccination deadline aggravated. She used all of her sick leave between November of 2021 and January of 2022, then annual leave in February of 2022. She agreed to undergo testing to return to work, which occurred on camera before people whom she could not see, constantly asking for passport as ID verification and sending "threatening and very harsh emails" to send the results every Friday. This procedure caused severe stress that further aggravated her depression.

83.     Finally, the Department treated Plaintiffs with religious or medical objections to the vaccine as if they were fully infected with a severe and deadly communicable disease which they would inevitably spread to the workforce unless they were segregated, isolated or confirmed not infected via invasive testing.  For example:

a.      Plaintiff Michael Jackson attests that he was subjected to "constant commentary by other State Department personnel, in person and online, disparaging and vilifying other employees for their personal medical decisions." He described the atmosphere within the State Department as "intolerant."

b.      When Plaintiff Maria Ballerini-Hougnon shared her legitimate concerns with her Management Officer that given her substantial medical conditions, she feared the vaccine could kill her, he "laughed aloud" twice. Another colleague asked, "how can you live with yourself knowingly jeopardizing everyone around you?" Fearing for her life, she was forced to resign.

c.      Plaintiff Donald Carroll was told by the Department that his religious accommodation was "granted," but was still bullied and badgered in official communications to get the vaccine – regardless of his religious beliefs.

d.      Despite Plaintiff David Guerrero's religious beliefs against the mandate, the Consul General at his post openly "berate[d]" and "verbally ridicule[d]" those who did not have the vaccination in "rants" that were "silencing and shaming."

e.      Plaintiff Christopher Kelly was called into his direct supervisor's office and ordered to put his mask on "immediately."

f.      Plaintiff Cheryl Korevoet was literally quarantined upon her arrival at a new duty station, despite having no symptoms and not having been exposed to anyone with COVID-19. This action immediately outed her as unvaccinated and led to a disastrous

time at her new post, where she could not attend any mission social functions or team-building exercises, including the annual Marine Ball, Thanksgiving events, and parties at the Deputy Chief of Mission residence. Daily she encountered official ostracism and harassment and was unable to effectively integrate into her new post.

g.   Plaintiffs were excluded from myriad other activities including work-related functions and training and development events.

<u>Temporary Vaccine Recission</u>

84.   On January 21, 2022, a federal district court issued an injunction against EO 14043 (which was later upheld by the full *en banc* Fifth Circuit Court of Appeals in *Feds for Medical Freedom v. Biden*, 63 F.4th 366 (5th Cir. 2023)).

85.   The Department suspended its vaccine mandate for the time being but continued implementing its testing / screening protocols.

86.   Finally, on May 12, 2023, President Biden rescinded E.O. 14043, thereby revoking the government-wide COVID-19 vaccine mandate for federal employees.

87.   For Plaintiffs who were still employed by the Department, this was the first time in years that they could breathe easy and fully accept that they would not have to lose their livelihoods just to honor and be faithful to their religious beliefs.

88.   While this was the right action, particularly given Fifth Circuit Court of Appeal's decision in *Feds for Medical Freedom*, after almost two years, this recission is too little too late. The harm has been done and it still continues.[4]

---

[4] Indeed, the Biden administration submitted a Petition for a Writ of Certiorari in *Feds for Medical Freedom* in July 2023, indicating the government has an interest in overturning the decision against it.

<u>Procedural Posture</u>

89.     Mr. Thornton's EEO complaint progressed, and after a request for information and a status conference, on October 26, 2022, Administrative Judge Meghan A. Droste issued an order denying both the class certification and the underlying claims.

90.     All identified Plaintiffs in the instant action were part of Mr. Thornton's EEO class complaint and have therefore exhausted their administrative remedies.

91.     The Department issued a letter implementing the decision of the Administrative Judge on November 29, 2022.

92.     Plaintiffs filed a Complaint with this Court against all Defendants on February 27, 2023.

93.     Plaintiffs filed an Amended Complaint against all Defendants on March 20, 2023.

**CLASS ALLEGATIONS**

94.     Certification of a class is appropriate in this action, with Plaintiff Marcus Thornton as representative class agent.

95.     The proposed class consists of all State Department employees whom the State Department discriminated against based on a perceived disability when it required illogical and onerous testing screening protocols and other unlawful restrictions on their employment. It also consists of a subclass of those same employees who notified the Department that their sincerely held religious beliefs conflicted with the vaccine mandate, and whose request for accommodations went unfulfilled and/or amounted to no accommodation at all. Finally, the proposed class consists of a second subset of employees who filed for a medical accommodation to be exempt from the vaccine but whose requests were unreasonably denied.[5]

---

[5] Plaintiff Marie Ballerini Houghon is the designated class agent for this subclass.  Mr. Thornton is the class agent for all other claims.

96.    Federal Rule of Civil Procedure 23(a) provides four criteria for courts to determine whether class certification is appropriate:

    i)   The class is so numerous that joinder of all members is impracticable;

    ii)  there are questions of law or fact common to the class;

    iii) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

    iv) and the representative parties will fairly and adequately protect the interests of the class.

97.    "Federal courts should give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case best serve the ends of justice for the affected parties and . . . promote judicial efficiency." *Gunnells v. Healthplan Servs.*, 348 F.3d 417, 424 (4th Cir. 2003), citing *In re A.H. Robins*, 880 F.2d 709, 740 (4th Cir. 1989) (internal quotations omitted).

98.    The U.S. Court of Appeals for the Fourth Circuit is clear that:

> The final three requirements of Rule 23(a) tend to merge, with commonality and typicality 'serving as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.
>
> *Brown v. Nucor Corp.*, 2009 U.S. App. LEXIS 22224 *6 (4th Cir. Jan. 27, 2009) (citing *Broussard v. Meineke Discount Muffler Shops*, 155 F.3d 331, 337 (4th Cir. 1998) (internal citations omitted)).

99.    Class certification of a pattern-or-practice claim may be based on inferential, statistical or direct evidence of discrimination. *Stastny v. S. Bell Tel. & Tel. Co.*, 628 F.2d 267, 278 (4th Cir. 1980). Indeed, "[e]vidence need not be conclusive to be probative, and even evidence that is of relatively weak probative value may be useful in meeting the commonality requirement."

*Brown*, 2009 U.S. App. LEXIS at *18 (noting that "an in-depth assessment of the merits of appellant's claims [upon a motion for class certification] would be improper." Id. at *20.

Numerosity

100.    Class certification is proper when joinder of all parties in impracticable. Fed. R. Civ. P. 23(a)(1). "[T]here is no mechanical test for numerosity and the determination 'turns on the nature of the claim of discrimination asserted by the plaintiffs and the number of persons who could have been injured by such discrimination.'" *Holsey v. Armour & Co.*, 743 F.2d 199, 217 (4th Cir. 1984) (*citing Kelley v. Norfolk & W. R. Co.*, 584 F.2d 34, 35 (4th Cir. 1978) (affirming lower court's certification of class concluding that "the determination of numerosity is a discretionary matter").

101.    Here, the class includes 25 identified members (named herein), with the likelihood of several hundreds (if not thousands) more.

102.    A certified class in this case would include all State Department employees who failed to succumb to the vaccine mandate, regardless of the reason. If, as Plaintiffs allege, the Department perceived unvaccinated employees as disabled, this class is easily ascertainable based on records the Department most certainly maintains.[6]

103.    The Department employs over 78,000 employees, including 13,000 in the Foreign Service, 11,000 Civil Service, 50,000 locally employed staff and more than 270 diplomatic missions world-wide.

104.    According to the White House, by January 2022, over 93% of the federal workforce at large had received at least one dose of the Covid-19 vaccination. David Shepardson, et al., *U.S. judge blocks Biden federal employee COVID vaccine mandate*, REUTERS, (January 21, 2022),

---

[6] Employees were required to attest to their vaccination status in the Department's electronic system of record, so these numbers should be readily available.

https://www.reuters.com/legal/government/us-judge-blocks-biden-federal-employee-covid-19-vaccine-mandate-2022-01-21/. Accordingly, approximately 7% of employees remained unvaccinated.

105.   Assuming this statistic holds true for the State Department (for which discovery would be necessary) 5,460 employees (7% of 78,000) remained unvaccinated. Even if only half of those employees decided to seek redress , the class, including Plaintiffs identified herein, would be over 2500 employees.

106.   A certified sub-class in this case would include all State Department employees who requested a religious accommodation to the vaccination requirement and either did not receive one because their requests were ignored, or purportedly received one, but effectively were treated like all others whose requests were ignored.

107.   According to Katy Kale, Deputy Administrator of the General Services Administration ("GSA") and one of only two co-chairs of the Safer Federal Workforce Task Force, approximately 5% of GSA's employees sought a religious accommodation to be exempt from the vaccine, less than 1% filed for a medical accommodation and the rest did not request an exemption at all. E-mail from GSA Deputy Administrator Katy Kale to mailing list, Reentry Update #14 – Thank You and Legal Update, January 24, 2022.

108.   Again, assuming the GSA numbers are representative of the State Department, the number of Department employees who requested a religious accommodation would be 3900 (5% of 78,000).[7] If even half of those employees sought redress for their failure to be accommodated,

---

[7] GSA's numbers appear to be consistent with federal government reports at the time. Washington Post, Lisa Rein, *et al.*, *Nearing Monday coronavirus vaccine deadline, thousands of federal workers seek religious exemptions to avoid shots*, November 21, 2021, 6:00 a.m. EST, ("Officials estimate that most unvaccinated employees who have not quit or retired by this point are seeking an exemption"). Moreover, the number of those who filed religious accommodation requests is likely significantly higher than those who filed for medical accommodations. *Id.* ("A far smaller number of employees have asked for exemptions on medical grounds, officials said, prompting what are likely to be more clear-cut decisions on whether to grant them.")

the subclass would consist of over 1950 employees – undoubtably too many to be adjudicated individually.

109.   Finally, a second certified subclass would include all State Department employees who sought a medical exemption to the vaccine but were denied. Assuming approximately 1% of employees filed for a medical accommodation (based on GSA's statistics), 780 employees (including several identified Plaintiffs) would be eligible to be part of the class.

110.   These assumptions evidence the large numbers of employees whose rights were violated when the Department did not accommodate their religious faith or medical issues.

111.   The Department can readily identify all employees who were unvaccinated and filed a religious or medical exemption request to the vaccine during the period of approximately September 1, 2021 (two months before the Department submission deadline of November 22, 2022), to the date the vaccine mandate was rescinded (May 23, 2023). This expanded timeframe would include employees who joined the Department after November 22, 2021, and who filed (or attempted to file) an exemption request upon hire.

112.   The Department likewise has data showing any exemptions that it granted, as well as any accommodations it denied or failed to adjudicate.

113.   Plaintiffs seek discovery to identify the full scope of the potential class in this matter.

114.   The members of the class are ascertainable and are sufficiently numerous that joinder of all members is impracticable.

<u>Commonality</u>

115.   As the Fourth Circuit has stated, "[t]he standard for commonality is not high. Rather, it merely requires that the resolution of common questions affect all or a substantial number of the class members. Allegations of similar discriminatory employment practices, such as the use of entirely subjective personnel processes that operate to discriminate, satisfy the commonality and

typicality requirements of Rule 23(a)." *Brown*, 2009 U.S. App. LEXIS at 7 (*citing Shipes v. Trinity Industries*, 987 F.2d 311, 316 (5th Cir. 1993).

116.    Indeed, "for purposes of Rule 23(a)(2) even a single common question will do." *Ealy v. Pinkerton Gov't Servs.*, 514 Fed. Appx. 299, 304 (4th Cir. 2013), *citing Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2556, 180 L. Ed. 2d 374 (2011) (internal quotations and alterations omitted).

117.    Not just any common question will do, however. *Id.* Rather, "commonality requires the plaintiff to demonstrate that the class members have suffered the same injury - a shared injury that also springs forth from the same common contention. That common contention, moreover, must be of such a nature that it is capable of classwide resolution - which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* (internal quotations and alterations omitted).

118.    At the time of certification, the court is "only concerned with the commonality (not the apparent merit) of the claims and the existence of a sufficiently numerous group of persons who may assert those claims." *Brown*, 2009 U.S. App. LEXIS at *8-*9 (*citing Lilly v. Harris-Teeter Supermarket*, 720 F.2d 326, 332-33 (4th Cir. 1983).

119.    The central question of law here, common to all potential Plaintiffs, is whether Defendants, as evidenced by their statements and policies, perceived their unvaccinated employees as disabled, thus requiring them to test, isolate, mask, and endure other unnecessary and illogical restraints, including even forced resignation.

120.    The second common contention is one of fact – that is the Department's implementation of the vaccine mandate and its process for accommodating religious believers who objected to it. The related question of law is whether the Department failed to accommodate Plaintiffs' religious requests for exemption to the vaccine. This issue is "central to the validity of

each one of the claims in one stroke." *Ealy*, 514 Fed. Appx. at 304. Finally, there is a central question of fact as to how the Department handled employees' medical accommodation requests and whether as a matter of law, it failed to accommodate their disabilities.

121.    These issues are based on the same data set of employees and again are easily ascertainable through discovery.

Typicality

122.    "Typicality under Rule 23(a)(3) requires an inquiry into the 'representative parties' ability to represent a class . . . .'" *Id.* at 304-305 (*citing Dieter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006). A class representative's claims and the claims of other members of the class do not need to be "perfectly identical or perfectly aligned;" however, the class representative's "pursuit of his own interests must simultaneously tend to advance the interests of the absent class members." *Id.* (internal citations and quotations omitted).

123.    Plaintiff Marcus Thornton's interests are completely aligned with the other members of the class. The Department perceived him as disabled when he was not vaccinated, as it also perceived all other unvaccinated employees. Moreover, the policies that gave rise to Department's failure to accommodate Mr. Thornton's request for a religious exemption and the harm he suffered, are the same as the others in the class, as the policies that gave rise to those harms were Department-wide policies creating an approach that applied to all individuals who sought a religious accommodation to the vaccine requirement. Mr. Thornton's experiences (though not identical) were substantially similar experiences as other potential class members throughout the Department.

Adequacy of Representation

124.    The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. *Amchem Prods. v. Windsor*, 521 U.S.

591, 625 (1997). A class representative must be part of the class and possess the same interest and suffer the same injury as the class members."

125.     "In evaluating whether a class representative will adequately protect the interests of the class members, the Court should consider two principal requirements: (1) the named representative must not have antagonistic or conflicting interests with the unnamed members of the class, and (2) the representatives must appear able to vigorously prosecute the interests of the class through qualified counsel." *Valerino v. Holder*, 283 F.R.D. 302, 318 (4th Cir. 2012) (citing *Nat'l Assoc. for Mental Health, Inc. v. Califano*, 717 F.2d 1451, 1458, 230 U.S. App. D.C. 394 (D.C. Cir. 1983) (internal quotations omitted).

126.     In this case, there are no identifiable (or even likely) conflicts between Mr. Thornton, the other currently identified class members and any as yet unnamed class members. As noted above, most, if not all of the currently identified Plaintiffs are members of the non-profit organization which Mr. Thornton co-founded and is currently President. That organization is comprised of over 8000 federal government employees who (like him) are fighting for the freedom of employees from government mandates and overreach such as was the case with the COVID-19 vaccine mandate. Accordingly, Mr. Thornton and likely all putative Plaintiffs share the same goal and have the same interests in seeing justice done in this case.

127.     Additionally, Mr. Thornton's advocacy as President of F4MF can only be seen as evidence of his passion, ability and wherewithal to represent Plaintiffs in this case.

128.     Finally, Mr. Thornton has clearly suffered many of the same harms as the other Plaintiffs. The Department perceived him as disabled when it prohibited him from participating in his Foreign Language classes, it failed to accommodate his religious beliefs, yet continuously and coercively threatened his job and his livelihood, and ultimately sought to remove him from his post for not complying with their illegal and discriminatory demands.

129.    He was subject to the same policies, the same repercussions of these policies, and the same culture that other potential class members experienced. He has taken an active role in organizing the potential class members, obtaining their statements, making initial contact with counsel, and providing all necessary follow-up. He is in all ways adequate to represent the interests of the class contemplated here.

130.    As for the competence and zeal of counsel representing the putative class, counsel has extensive experience with employment-related class action claims and complex litigation in multiple contexts. In counsel assisting with the case has extensive employment experience at two of the nation's top employment firms and has worked on several class-action cases in that context, including the *Dukes v. Walmart* class action. Counsel will provide more detail on this point in a forthcoming motion for class certification.[8]

### Additional Considerations

131.    Rule 23 goes on in subsection (b) to require plaintiffs to identify additional justifications for class certification. Here, class certification is appropriate according to Rule 23 (b)(3).

132.    Here, as indicated in Rule 23(b)(3), "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

133.    Most of the Plaintiffs identified here have already proceeded together as a putative class through the administrative phase. Relief on behalf of one member of the putative class would necessarily apply to the entire class of individuals identified here and who have yet to be identified.

---

[8] For the subclass related to claims of disability discrimination, Ms. Ballerini-Hougnon is part of the class and has the same interests and suffered the same injury as other class members whose medical accommodations were denied by the Department.  There is no indication of any conflict between her and other class members with her same claims and she is a zealous advocate for the cause.

134.    The substantial similarity in experience and in harm mitigates any interest of the individual class members' need to prosecute these claims. To the extent the harms differed, they fall within definable categories that are easily manageable.

135.    A class action would be the superior method by which to adjudicate their claims because of the similarities of the experience of the individual members, who all experienced the same policies and the same culture within the State Department.

<u>Relief Allegations</u>

136.    Defendant's actions caused and continue to cause Plaintiffs and class members devastating harm.

137.    All Department employees who filed religious exemptions to the vaccine lived in constant fear of being placed on AWOL status or losing their jobs and many made drastic changes in their finances, relationships or living arrangements.

138.    Several Department employees were forced out of their jobs, lost their healthcare, lost their pensions, drained their retirements, lost their homes and in many cases had to uproot their families so that they could try to continue their professions in their chosen careers.

139.    Many were unable to effectively perform their jobs because they were not allowed to enter work facilities or meet with clients, and many were denied travel opportunities for training and development.

140.    Many employees succumbed to testing under duress for fear of discipline or losing their jobs, and at least two known Plaintiffs succumbed to the pressure to take the vaccine while waiting for their exemption requests to be adjudicated.

141.    Many suffered physical and mental health effects and were forced to take leave and / or seek medical help due to the constant coercion to be vaccinated and the harassment created by being treated as disabled and a threat to others.

142.     Still others – who applied for religious exemptions and have avoided the more immediate and direct damages to their jobs or their health – had their privacy invaded by the imposition of the vaccine attestation and testing requirements, and the requirement that they unnecessarily disclose intimate and sensitive facts about their religious convictions and medical conditions.

143.     Plaintiffs and class members are entitled to compensation for losses in earnings, promotional opportunities and employment benefits, injury to reputation and emotional distress – in amounts to be determined at trial.

## CLAIMS FOR RELIEF

### COUNT ONE
### (The Rehabilitation Act of 1973)

<u>Disability Discrimination</u>
<u>"Regarded As"</u>

144.     Section 501 of the Rehabilitation Act of 1973 ("the Rehab Act" or "Section 501"), as amended, 29 U.S.C. §791 *et seq*., precludes employers from discriminating against federal employees on the basis of an actual or perceived disability.

145.     The standards used to determine whether Section 501 has been violated shall be the standards applied under the Americans with Disabilities Act ("ADA"). 29 C.F.R. §1614.203(b).

146.     No employer shall discriminate against a qualified individual on the basis of disability. 42 U.S. code §12112(a).

147.     "The Federal Government shall be a model employer of individuals with disabilities." 29 C.F.R. §1614.203(c).

148.     The ADA defines the term "disability," with respect to an individual: (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. §12102(1)(A)(B)(C).

> An individual is "regarded as having such an impairment" if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, *whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity.*

> 29 CFR 1630.2 (l)(1) (emphasis added).

149.    With the pandemic came mass hysteria throughout the U.S. and the world.  And while the pandemic spawned a new era in conflicts and disputes in families, workplaces and communities, most people universally agree that it also ushered in a tidal wave of extreme fear, anxiety, stress and death for millions of people. [9]

150.    Here, Defendants treated employees who were unvaccinated as disabled. Based on the illogical restrictions and testing screening protocols they placed on Plaintiffs, it is clear they believed (or at least treated Plaintiffs as if they believed) Plaintiffs were at all times at risk of spreading a deadly disease that could severely harm and/or kill employees.

151.    Mr. Thornton was outright prohibited from attending his Foreign Language School, in which he was enrolled, rendering him unable to fully participate in the course and impacting his ability to gain the professional benefit of speaking Russian.

152.    Other Plaintiffs were peppered with "disparaging and vilifying" comments such as "How can you live with yourself knowingly putting others' lives at risk?"

153.    They were isolated from others and even quarantined, notwithstanding they had no symptoms of COVID-19 and had not knowingly been exposed to it.

---

[9] The United States reports the highest death toll from COVID-19 of any other country at over 1.1 million people. Cecelia Smith-Schoenwalder, U.S. News and World Report, , *Three Years of Death – and Finger-pointing*, March 10, 2023, https://www.usnews.com/news/the-report/articles/2023-03-10/three-years-into-the-pandemic-who-is-dying-from-covid-19-now#:~:text=Three%20Years%20of%20Death%20%E2%80%93%20and,to%20know%20how%20it%20started. "Globally, more than 6.8 million people have died from COVID-19. That number is considered to be an undercount, with some reports estimating the true death toll is more than double the official account." *Id.*

154.    They were openly "berate[d]" and "verbally ridicule[d]" for not being vaccinated in "rants" from leadership that were "silencing and shaming."

155.    They were "outed" by being made to wear masks (which did not work), signaling to others that they were a danger and commanded to put on a mask "immediately" upon entering a supervisor's office.[10]

156.    They were forced to perform Covid-19 tests on themselves on video (rather than in person) in front of people they had never met before.

157.    It belies logic to think that Defendants took these actions against their (in most cases), long-standing, highly valued employees if they did not believe the employees posed an imminent threat of spreading a deadly disease to others.

158.    The Supreme Court has stated that "by including 'regarded as' in the statutory definition, Congress acknowledged that society's accumulated myths and fears about disability and disease  are as handicapping as are  the  physical  limitations  that  flow  from  actual impairment." *Runnebaum v. NationsBank of Maryland, N.A.*, 123 F.3d 156, 173 (4th Cir. 1997) (*citing School Bd. of Nassau County v. Arline*, 480 U.S. 273, 284, 94 L. Ed. 2d 307, 107 S. Ct. 1123 (1987), (which held that the negative reactions of others "could nevertheless substantially limit that person's ability to work.")

159.    The Defendants created a culture of myths and fears which were "as handicapping" to Plaintiffs as physical impairments. *Id.* Indeed, "the negative reactions of others" substantially

---

[10] Bret Stephens, *The Masks Did Nothing. Will Any Lessons Be Learned?,* N.Y. TIMES, (Feb. 21, 2023), ("The most rigorous and comprehensive analysis of scientific studies conducted on the efficacy of masks for reducing the spread of respiratory illnesses — including Covid-19 — was published late last month. Its conclusions, said Tom Jefferson, the Oxford epidemiologist who is its lead author, were unambiguous. 'There is just no evidence that they' — masks — 'make any difference,' he told the journalist Maryanne Demasi"), https://www.nytimes.com/2023/02/21/opinion/do-mask-mandates-work.html.

limited Plaintiffs' ability to work, causing them to suffer ostracization, fear for their jobs, ridicule, and an inability to perform their jobs to the fullest of their ability. *Id.*

160.    Defendants treated every single Plaintiff as if they were disabled - not that they were potentially suffering from some minor or transitory ailment, but that they were an existential, direct threat to the Department.

161.    The ADA "provides that employment qualification standards may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C.S. § 12113(b). *Leblanc v. Honeywell Int'l, Inc.,* 2021 U.S. Dist. LEXIS 231916, *1.

162.    "The determination that an employee poses a 'direct threat' must be based on an individualized assessment of the employee's present ability to safely perform the essential functions of the job." 29 C.F.R. 1630.2(r).

163.    This the Department did not do.

164.    Defendants did not consider individual health factors, prior exposure to COVID-19, natural immunity, or any other number of factors that could be helpful in determining whether Plaintiffs presented undue risk.

165.    Rather, it made a sweeping assessment that anyone who did not accept the vaccine was a substantial danger to other employees and could not even be permitted at work, without arbitrary testing / screening procedures.

166.    The Department engaged in prohibited conduct which violates 42 USC §12203(b) and 29 C.F.R. §1630.12(b). The Defendants harassed, intimidated, coerced and interfered with Plaintiffs' and class members' rights. The consequences include, but are not limited to, threats of, and actual discipline and termination, denial of travel and missed job opportunities, and the ability

to perform essential functions of the job by attending work onsite and interacting with others in person.

Disability Discrimination<br>Disparate Treatment

167.     § 504 of the Rehabilitation Act provides that "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498

168.     To establish this *prima facie* case, a plaintiffs must show that: (1) she is disabled; (2) she was otherwise qualified for the position; and (3) she suffered an adverse employment action solely on the basis of her disability. *Hannah P. v. Coats*, 916 F.3d 327 (4th Cir. 2019)

169.     In this case, Ms. Ballerini-Houghton (and likely many of putative plaintiffs) has a disability by reason of her VA rating as "100% permanently disabled." The Department knew about her disability both because they were aware of her VA rating and because she requested an exemption from the vaccine due to her disability. She has a positive performance record and was qualified for her job. She was constructively discharged, when she was essentially told that she had to take a vaccine that could potentially kill her – or leave her role. This treatment and ultimatum by Mr. Kirby made her working conditions intolerable. For fear of nothing less than the loss of her own life, Ms. Ballerini-Houghon was forced to resign. *See United States EEOC v. Consol Energy, Inc*., 860 F.3d 131, 136 (4th Cir. 2017) (an employee is constructively discharged when an employer deliberately makes the working conditions of the employee intolerable) (in the context of a religious discrimination).

170.     Upon information and belief, other plaintiffs, as yet unidentified, suffered similar experiences which will be revealed in discovery.

33

<u>Disability Discrimination</u>
<u>Failure to Accommodate</u>

171.    Likewise, for the reasons stated above, Defendant violated Ms. Ballerini-Houghon's and other plaintiffs by failing to accommodate them based on their disabilities.

172.    To establish a prima facie claim for failure to accommodate, plaintiff must establish (1) that he had a "disability" as defined by the ADA; (2) that defendant had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position; and, (4) that defendant refused to make such accommodations. *Rhoads v. Fed. Deposit Ins. Co.*, 257 F.3d 373, 387 n. 11 (4th Cir. 2001).

173.    In this case, Ms. Ballerini-Houghon undisputedly had a disability that Defendant was aware of, she could have easily continued to perform her job without having to take the vaccine, yet instead of granting her request for an accommodation, the Department basically instructed her to jeopardize her life (by succumbing to the vaccine) or leave the Department.

**COUNT TWO**
**(Title VII Religious Discrimination: Failure to Accommodate)**

174.    The Department of State has failed to accommodate the religious beliefs of Mr. Thornton, 19 other identified Plaintiffs and likely thousands more.

175.    Title VII of the Civil Rights Act of 1964 requires employers to accommodate the religious practice of their employees unless doing so would impose an undue hardship on the conduct of the employer's business. 42 U.S.C.S. § 2000e(j), *Groff v. DeJoy*, 143 S. Ct. 2279, 2286 (2023).

176.    As the Supreme Court has stated,

Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. *Rather, it gives them favored treatment*, affirmatively obligating employers not "to fail or refuse to hire or discharge any individual . . . because of such individual's religious observance and practice.

34

*EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775, 135 S. Ct. 2028, 2034 (2015) (emphasis added and internal citations omitted).

177.    To establish a *prima facie* religious accommodation claim, a plaintiff must establish that: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *Chalmers v. Tulon Co.*, 101 F.3d 1012, 1019 (4th Cir. 1996) (*quoting Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2d Cir. 1985)).

178.    Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to demonstrate either that it reasonably accommodated the employee, or that it was unable to reasonably accommodate the employee's needs without undue hardship. *Id.*

179.    The Supreme Court recently clarified that, "'undue hardship' is shown when a burden is substantial in the overall context of an employer's business." That inquiry it described as "fact specific." *Groff v. DeJoy*, 2023 U.S. LEXIS 2790, *28 (2023).

180.    The term "Religion" includes:

> All aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

*Eeoc v. Ithaca Indus.*, 849 F.2d 116, 122 n1. (4th Cir. 1988).

181.    Mr. Thornton (as well as the other identified Plaintiffs who requested a reasonable accommodation) all had sincere religious beliefs that conflicted with receiving the vaccine. Mr. Thornton's Christian beliefs regarding the sovereignty of God, being made in the image of God and not allowing others to usurp God's power, directly conflicted with the government's forced requirement for every employee to take the vaccination.

182.    Mr. Thornton and other identified Plaintiffs each made such conflict known to the Department by filing a religious accommodation exemption request, an EEO charge and/or by notifying the Department verbally about their beliefs.

183.    As a result of such actions, the Department punished Mr. Thornton by ostracizing, him, prohibiting from participating in his Foreign Language School, denying him the ability to be trained as an EEO counselor (after being endorsed by his embassy), denying him the use of parental and other accrued leave and ultimately proposing for removal from his assignment by the Department.

184.    Other Plaintiffs suffered similar adverse actions. Defendants discharged, threatened, suspended, tested, or otherwise subjected Plaintiffs to adverse employment actions because their faith precluded them from taking the vaccine.

185.    Defendants repeatedly threatened Plaintiffs in writing with discipline, administrative leave, and removal from the Department if they failed to be vaccinated without an approved accommodation.

186.    Plaintiffs clearly allege a prima facie case of failure to accommodation.

187.    Moreover, on their face, the facts demonstrate that the Department utterly failed in its duty to accommodate Plaintiffs' religious beliefs.

188.    The Department completely ignored many Plaintiffs' requests for accommodation, by failing to adjudicate their claims. Other than sending an acknowledgement that the Department received Plaintiffs' requests, they never processed, considered, evaluated, or even sought additional information from Plaintiffs about their requests, leaving Plaintiffs to languish in a state of fear and anxiety over whether their jobs were safe[11]

---

[11] Although the Department allegedly "granted" the accommodations of five Plaintiffs (Donald Carroll, Jane Chun, David Guerrero, Christopher Kelly and Christina Williams), the Department treated them exactly the same as other Plaintiffs whose requests were ignored. They were forced to test, mask and socially isolate and they were denied the opportunity to attend work related events and to engage in training and development.

189.    The statutory framework for determining reasonable accommodation requires an interactive process and participation by both the employer and the employee. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986) (stating that, consistent with the goals expressed in the legislative history of the religious accommodation provision, "courts have noted that bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business") *Id., see also Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141 (5th Cir. 1982)

190.    "Once an employee makes [an accommodation] request, the employer is obligated by law to engage in an interactive process - a meaningful dialogue." *Equal Emp. Opportunity Comm'n v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009) (in the context of a disability).

191.    Here, Defendants neither requested nor proposed that Plaintiffs participate in any discussion to determine fair and legal accommodations for their religious beliefs. They did not follow up with Plaintiffs to ask questions or make requests for clarifications and they did not make any effort pursue an "acceptable reconciliation for both parties." *Ansonia Bd. of Educ.*, 479 U.S. at 69.

192.    Moreover, courts have found that that delay in providing an accommodation amounts to a failure to accommodate. *See e.g., Matos v. Devos*, 317 F. Supp. 3d 489 (D.D.C. 2018) (in the context of an ADA claim).

193.    The principle of delay-as-discrimination translates into the context of religious accommodation. In *Tabura v. Kellogg USA*, 880 F.3d 544, 550 (10th Cir. 2018), the 10th Circuit Court of Appeals cited both religious accommodation and ADA case law for the proposition that "Title VII requires that an employer, short of undue hardship, make reasonable accommodations to the religious needs of its employees." (citations omitted).

194.    Moreover, as the Sixth Circuit Court of Appeals has stated, in the context of a Title VII religious discrimination claim, "'a week-to-week, wait-and-see posture' amounts to no accommodation at all" *EEOC v. Robert Bosch Corp.*, 169 F. App'x 942, 945 (6th Cir. 2006) (*citing EEOC v. Arlington Transit Mix, Inc.*, 957 F.2d 219, 222 (6th Cir. 1991)).

195.    Furthermore, in *Doster v. Kendall*, No. 1:22-cv-84, 2022 U.S. Dist. LEXIS 125400, at *10-13 (S.D. Ohio July 14, 2022), the court treated both delay and denial of religious accommodation as "injury" for the purpose of class certification analysis in a Religious Freedom Restoration Act / First Amendment case.

196.    The Department in this case has delayed accommodation with respect to Plaintiffs' religious exemption requests to the vaccine. This delay amounts to a denial of accommodation. While the Department may state that an injunction preventing the enforcement of the mandate is the reason for the delay, the injunction could have disappeared any day, leaving unaccommodated religious believers to suffer adverse employment consequences.

197.    The stress of knowing that these difficulties could drop back into their lives at any moment has followed these individuals around for over a year. For those who did not suffer termination, constructive discharge or being forcibly placed on leave, they still suffered harm. They lived under the constant duress of not knowing whether their jobs would be protected and whether their livelihoods and families would be forsaken. *See Sambrano v. United Airlines, Inc*., No. 21-11159, 2022 U.S. App. LEXIS 4347, 12 (5th Cir. 2022) (holding that plaintiffs who were subject to the vaccine mandate were "subjected to ongoing coercion based on their religious beliefs. That coercion is harmful in and of it self . . .") (*citing BST Holdings, L.L.C.vs. OSHA,* 17 F. 4th 604, 618 (5th Cir. 2021) (holding that Plaintiffs had suffered irreparable harm from being coerced into "a choice between their job(s) and their jab(s)"). *See also Feds for Med. Freedom v. Biden*, 2023 U.S. App LEXIS 7018, 43 (5th Cir. 2023) ("[w]hen a regulation is directed at [plaintiffs] in particular

and requires them to make significant changes, plaintiffs have suffered an injury to challenge the order even if the Government has yet to elucidate the precise consequences of failing to comply. . . Plaintiffs do not have to identify exactly how the Government will enforce the mandate; it's enough that plaintiffs face the ominous order, 'get vaccinated or else.'" (internal citations omitted)

198.    If Defendants had processed Plaintiffs' requests for an exemption to the vaccination in any meaningful way, none of these harms would have occurred.

### COUNT THREE
### (Title VII Religious Discrimination)
### Disparate Treatment

199.    The Civil Rights Act of 1964 states in relevant part:

> It shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C.§ 2000e-2(a); § 2000e-16(a) (emphasis added).

200.    "The Fourth Circuit has held that absent direct evidence of discrimination, a party seeking relief for discrimination is required to allege in his complaint: (1) membership in a protected class, (2) satisfactory job performance, (3) adverse employment action, and (4) different treatment from similarly situated employees outside the protected class." *Blakes v. Gruenberg*, 2016 U.S. Dist. LEXIS 100903, *21-22 (*citing White v. BFI Waste Servs.*, LLC, 375 F.3d 288, 295 (4th Cir. 2004).

201.    As stated above, Mr. Thornton and other religious believers have sincerely held religious beliefs which conflict with the vaccine mandate. "It is not [the Department's] place as an employer, nor ours as a court, to question the correctness or even the plausibility of [plaintiff's] religious understandings." *United States EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 142-143

(*citing Empl. Div. v. Smith*, 494 U.S. 872, 887, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990) ("Repeatedly and in many different contexts, we have warned that courts must not presume to determine . . . the plausibility of a religious claim.").

202.    Accordingly, they are members of the protected class of religious believers.

203.    They have experienced "outing" experiences such as masking, testing, and social isolation (i.e., such as forced absence from office-wide work gatherings and training and development opportunities). Many lost opportunities for travel, temporary assignments, and opportunities at career advancement because of their religious beliefs. At least two were constructively discharged by being forced to resign due to intolerable working conditions.[12] Mr. Thornton himself was denied use of accrued personal and parental leave and is in the process of being removed from his current position. He and others were forced to use a different and more invasive procedure for requesting religious accommodation, and many Plaintiffs' request were completely ignored. The testing itself was physically invasive, uncomfortable and at the same time scientifically unjustified. It was supposed to be taken by prescription only and Plaintiffs were forced to test in front of strangers on video.

204.    Individuals who did not file a request for a religious (or medical) accommodation were not subject to any of the same harms as Plaintiffs. Discovery in this matter will show that they were not isolated from others, denied travel and training opportunities, or discharged from the positions. They were not "outed" as having a religious objection to the vaccine by being forced to uselessly mask or test in front of strangers on a video screen.

205.    The Department fostered a pervasive environment of religious discrimination in violation of Title VII of the Civil Rights Act.

---

[12] One Plaintiff (Maria Ballerini-Houghan) was constructively discharged based on the Department's continued threat of termination and its failure to accommodate her medical disability.

40

## COUNT FOUR
### (Religious Freedom Restoration Act)

206.    The Religious Freedom Restoration Act states in relevant part: "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability."

207.    Here, with respect to Mr. Thornton and all Plaintiffs who sought religious accommodation from the vaccination, the Department has burdened the exercise of religion by continuously threatening disciplinary action and termination, actually and constructively removing them from their posts, forcing religious believers to accept invasive and painful testing, stigmatizing masking and isolation, loss of professional opportunities, unequal accommodation procedures, and a culture of harassment and ridicule because of their disfavored religious beliefs.

208.    In doing so, it has not pursued the least restrictive means, as other approaches were available and previously utilized (i.e., remote work). It has not done so in pursuit of legitimate government ends, as vaccination did not prevent the transmission of COVID, and neither did masks.

209.    Rather, they simply presented Plaintiffs with two options: violate their religious convictions or risk their livelihoods and careers.

210.    As the 5th Circuit has held, the vaccine would "directly burden [Plaintiffs'] respective faiths by forcing them to inject an unremovable substance at odds with their most profound convictions. This injury would outlast their military service, making the decision whether to acquiesce far more difficult than just choosing between 'their job(s) and their jab(s)'. *Navy Seals*, 27 F4th at 350 (*quoting, BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021).

211.    Furthermore, in *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020), the Supreme Court has found that the Religious Freedom Restoration Act allows plaintiffs to recover money damages against federal officials in their individual capacities.

## PRAYER FOR RELIEF

212.   Plaintiffs respectfully request that the Court:

    a.   Compensatory damages for monetary and non-monetary loss;

    b.   Exemplary and punitive damages;

    c.   Prejudgment interest;

    d.   Reasonable attorney's fees under the Equal Access to Justice Act; and,

    e.   Such other relief as law or equity may pertain.

Dated: August 21, 2023

Respectfully Submitted,

E. Scott Lloyd
Virginia Bar # 76989
Lloyd·Lemmon, PLLC
15 Chester Street
Front Royal, VA 22630
(540) 631-4081
scott@lloydlemmon.com
Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I will cause the foregoing to be served upon the Defendants by electronic means on or about August 21, 2023.

SCOTT LLOYD